**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

     v.

KAHEIM ALLUMS,

           Defendant.

**15-CR-153 (VSB)**

**MOTION TO REDUCE SENTENCE ON BEHALF OF KAHEIM ALLUMS**

Michael Tremonte
Heather Y. Han
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
Fax: 212.202.4156
mtremonte@shertremonte.com

*Attorneys for Kaheim Allums*

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................1

PROCEDURAL HISTORY....................................................................................3

ARGUMENT.........................................................................................................4

   I.   THE COURT HAS AUTHORITY TO CONSIDER MR. ALLUMS'S MOTION FOR COMPASSIONATE RELEASE.......................................................................4

   II.  THE FIRST STEP ACT EMPOWERS THE COURT TO FIND "EXTRAORDINARY AND COMPELLING REASONS" OTHER THAN THOSE EXPRESSLY IDENTIFIED IN COMMENTARY TO U.S.S.G. § 1B1.13 ...................................................6

   III.  MR. ALLUMS'S PARTICULAR VULNERABILITY TO COVID-19 CONSTITUTES A "EXTRAORDINARY AND COMPELLING" REASON UNDER 18 U.S.C. § 3582(C)(1)(A)(I) THAT WARRANT A REDUCTION IN SENTENCE ....................8

      A.  Mr. Allums's Underlying Medical Conditions Make Him Particularly Vulnerable to COVID-19...............................................................................................10

      B.  Mr. Allums, Being Black, Stands a Statistically Higher Chance of Becoming Severely Ill or Dying From COVID-19 .....................................................................15

      C.  The Conditions of Confinement at FCI Loretto Make it Extremely Difficult for Mr. Allums to Adequately Practice Self-Care ...............................................17

      D.  FCI Loretto is Not Immune from the Penetration of COVID-19..............................19

      E.  Mr. Allums Plainly Meets the Standards Articulated in the DOJ's New Policy Concerning Compassionate Release on COVID-19 Grounds ..................................21

   IV.  A REDUCTION IN SENTENCE IS ALSO CONSISTENT WITH THE SENTENCING GOALS SET FORTH IN 18 U.S.C. § 3553(A)...........................................................22

   V.  SHOULD THE COURT DECLINE TO REDUCE MR. ALLUMS'S SENTENCE TO TIME SERVED, MR. ALLUMS REQUEST A JUDICIAL RECOMMENDATION THAT THE BOP IMMEDIATELY TRANSFER HIM TO HOME CONFINEMENT...27

CONCLUSION .................................................................................................32

## INTRODUCTION

Kaheim Allums, by and through his attorneys, respectfully moves this Court to reduce his sentence to time served followed by a term of supervised release with a special condition of home detention pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

A middle-aged black man, Mr. Allums suffers from hypertension and asthma, which place him at heightened risk of contracting and becoming severely ill from COVID-19.  Moreover, the prisons are especially conducive to the spread of the virus; despite the Bureau of Prisons ("BOP")' best efforts, it has proven extremely challenging for inmates like Mr. Allums to adequately practice self-care.  As many courts around the country have found, a federal inmate's vulnerability to COVID-19 provides an extraordinary and compelling basis for compassionate release.

A sentence reduction to time served is also consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a), which the Court is required to consider anew in the context of an application for compassionate release.  Mr. Allums is currently incarcerated at FCI Loretto, a low security federal prison in Pennsylvania, and has served over one third of his 139-month sentence (including credit for good conduct) for participating in a non-violent, narcotics conspiracy. Mr. Allums has used his time in custody productively.  Since arriving at FCI Loretto in October 2018, he has completed numerous courses and programs.  Mr. Allums currently works as an orderly on his unit.  His recidivism risk score is "low."

While the passage of time has not altered the serious nature of Mr. Allums's offense, certain other considerations have undeniably changed since the time of sentencing.  Keeping Mr. Allums in conditions that threaten to jeopardize his health, and potentially even his life, cannot be deemed "just punishment" for the crime he committed and is "greater than necessary" to achieve the purposes of sentencing.  18 U.S.C. § 3553(a).  Moreover, Mr. Allums's consistent

rehabilitation efforts, combined with a low recidivism score, indicate that he is unlikely to re-offend or pose a danger to the community if released.  Lastly, in light of his particular vulnerability to COVID-19 and diminished ability to practice self-care in prison. releasing Mr. Allums will ensure that he is able obtain medical treatment as needed.

Should the Court not be inclined to grant compassionate release, we respectfully request that the Court  recommend the BOP immediately transfer Mr. Allums to home confinement, pursuant to 18 U.S.C. § 3621 and the Department of Justice ("DOJ")'s guidance regarding placing federal inmates in home confinement in light of the pandemic.

We attach to this memorandum the following documents: Defense counsel's letter to the FCI Loretto warden, dated May 15, 2020, requesting release of Mr. Allums (Exhibit A); Letter to defense counsel from the warden, dated May 19, 2020, denying Mr. Allums's release request (Exhibit B); Memorandum to Inmate Population, issued by the warden of FCI Loretto, dated June 2, 2020 (Exhibit C); Expert affidavit of Dr. Brie Williams, M.D. discussing the public health risks from keeping at-risk inmates incarcerated during the pandemic (Exhibit D); ██████████████ ██████████████████████████████; and Transcript of Mr. Allums's Sentencing Hearing (Exhibit F).

## PROCEDURAL HISTORY

Kaheim Allums was one of ten defendants charged with narcotics conspiracy and firearm possession in relation to narcotics conspiracy.  (*See* Docket Sheet, *United States v. Jones et al.*, 15 Crim. 153.)  He was arrested on August 23, 2016, and remanded to custody at the MCC in Manhattan, New York.  (Doc. No. 4.)  On June 27, 2017, a superseding indictment charged Mr. Allums with narcotics conspiracy, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846, and firearm possession in relation to narcotic trafficking, in violation of 21 U.S.C. §§ 924(c)(1)(A)(i) and 2.  (Doc. No. 266.)  On October 13, 2017, Mr. Allums pled guilty, pursuant to a plea agreement, to one count of narcotics trafficking in violation of 21 U.S.C. § 841(b)(1)(A).  (Dkt. Entry, Dated Oct. 13, 2017.)  At the plea hearing, Mr. Allums admitted to participating in a conspiracy to sell more than 5 kilograms of cocaine and 280 grams of crack cocaine between 2011 and August 2016 in Yonkers, New York.  (*See id.*)  He was subsequently transferred to the Metropolitan Detention Center ("MDC") while awaiting sentencing.

On August 30, 2018, this Court sentenced Mr. Allums to 139 months of imprisonment, followed by five years of supervised release.  (Doc. No. 529.)  Following sentencing, Mr. Allums was designated and transferred to the BOP facility at FCI Loretto (hereinafter "FCI Loretto"), a low security federal prison located in Pennsylvania, where he has been incarcerated since. Because Mr. Allums has been in continuous custody since his arrest in August 2016, he has effectively served approximately 45 months, or over 30 % of his sentence (including credit for good conduct).  According to the BOP website, Mr. Allums's projected release date is in June 2026.

On May 15, 2020, defense counsel submitted a letter to the warden of FCI Loretto, requesting the immediate transfer of Mr. Allums to home confinement pursuant to § 12003(b)(2)

of the CARES Act and Attorney General William Barr's directives, or, in the alternative, that the BOP file a motion for compassionate release on Mr. Allums's behalf pursuant to 18 U.S.C. § 3582(c)(1)(A). (Ex. A – K. Allums May 15 Release Request.)  By letter dated May 19, 2020, the warden denied Mr. Allums's compassionate release request and advised that Mr. Allums "w[ould] not receive priority treatment" for placement in home confinement.  (Ex. B – Warden V. Moser May 19 Reply).  On June 2, 2010, Warden Moser released a memorandum, advising inmates at FCI Loretto that "they DO NOT need to use or exhaust the Administrative Remedy process" if their requests for compassionate release are denied, and that they "may file an appeal for a denial . . . directly with the sentencing court 30 days after making the [] request to the Warden."  (Ex. C – Warden Moser June 2 Memorandum) (emphasis in original).

## **ARGUMENT**

I.   **THE COURT HAS AUTHORITY TO CONSIDER MR. ALLUMS'S MOTION FOR COMPASSIONATE RELEASE**

The Court has authority to consider this motion because Mr. Allums has met the procedural prerequisites laid out under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act.

Before the First Step Act was enacted, 18 U.S.C. § 3582(c)(1)(A)(i) permitted only the BOP to petition the court for compassionate release.  Dismayed at the low numbers of such petitions, Congress in 2018 amended the statute so as to expressly permit inmates, like Mr. Allums, to petition the court directly for a reduction in sentence and compassionate release. *See* 18 U.S.C. § 3582(c)(1)(A)(i); *see also* U.S. Dep't of Justice, *The Federal Bureau of Prisons' Compassionate Release Program*, p. 11 (2013); 164 CONG. REC. S7774 (daily ed. Dec. 18, 2018) (noting that the First Step Act's amendment to compassionate release law was Congress' response to the BOP's failure to "properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered").  While the statutory scheme

4

"preserve[ed] the BOP's role relative to a sentence reduction in certain limited respects," including requiring that the inmate first petition the warden to make such a motion on his or her behalf, "it eliminated the BOP Director's role as the exclusive channel through which a sentence reduction could be considered by courts." *United States v. Redd*, No. 1:97-CR-00006-AJT, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020). The compassionate release statute now allows the inmate to seek release *directly* from the court if "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A)(i); *see also* 164 CONG. REC. S7774 (daily ed. Dec. 18, 2018) (purpose of amendment to "expedite compassionate release applications").

Here, Mr. Allums has met the procedural prerequisites, putting his motion squarely within the Court's authority under the compassionate release statute. As noted above, on May 15, defense counsel submitted a written request to the warden of FCI Loretto, requesting that the BOP transfer him to home detention or move for compassionate release on his behalf. As of today, thirty days have elapsed since Mr. Allums made the request (through counsel) on May 15, which was denied by the warden on May 19. As confirmed in the warden's June 2 memorandum, "the First Step Act allows [Mr. Allums] to file an appeal for a denial of Compassionate Release/Reduction in Sentence (RIS) directly with the sentencing court 30 days after making the RIS request to the Warden"; he does "not need to use or exhaust the Administrative Remedy process." (*See* Ex. C – Warden Moser June 2 Memorandum). The warden's position is in keeping with the Sixth Circuit's opinion in *United States v. Alam*, No. 20-1298, 2020 WL 2845694 (6th Cir. June 2, 2020), that the inmate's "failure to satisfy th[e] administrative exhaustion requirement [following the denial of his

5

release request to the prison] does not deprive [the district court] of subject-matter jurisdiction" so long as the inmate waits 30 days after his first request to the prison before filing in court. *Id.*, 2020 WL 2845694, at *2.

Because Mr. Allums's release request to the warden has been denied, and because thirty days have elapsed since that request was first made, Mr. Allums's motion for compassionate release is squarely before the Court.

## II. THE FIRST STEP ACT EMPOWERS THE COURT TO FIND "EXTRAORDINARY AND COMPELLING REASONS" OTHER THAN THOSE EXPRESSLY IDENTIFIED IN COMMENTARY TO U.S.S.G. § 1B1.13

Under the First Step Act, a court may "'reduce the term of imprisonment' after finding that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Ebbers*, 432 F. Supp. 3d 421, 426 (S.D.N.Y. Jan. 8, 2020). "In making its decision, a court must also consider 'the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable.'" *Id.* (quoting 18 U.S.C. § 3582(c)(1)(A)). The legislative purpose of 18 U.S.C. § 3582(c) was to create "safety valves for modification of sentences" and Congress contemplated that the decision of whether "there is justification for reducing a term of imprisonment" would reside with the sentencing court, given that the traditional body that would consider such modification—a parole board—had been abolished in the federal system. S. Rep. No. 98-225, at 56, 121 (1983).

Historically, the BOP and courts looked to the policy statement set forth at § 1B1.13 of the U.S. Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") for guidance as to the "extraordinary and compelling" warranting a sentence reduction. *See, e.g.*, *United States v. Haynes*, No. 93 CR 1043 (RJD), 2020 WL 1941478, at *10-11 (E.D.N.Y. Apr. 22, 2020).

6

Application note 1 of the Commentary to U.S.S.G. § 1B1.13 sets forth grounds constituting

"extraordinary and compelling reasons" for release, which generally fall into four categories,

depending on a defendant's (1) terminal illness; (2) debilitating physical or mental health

condition; (3) advanced age and deteriorating health combined with the amount of time served; or

(4) compelling family circumstances.  U.S.S.G. § 1B1.13 cmt 1(A)-(C).  The application note also

includes a fifth provision for "extraordinary and compelling reason other than, or in combination

with, the reasons described in subdivisions (A) through (C)" as determined by the Director of the

Bureau of Prisons."  U.S.S.G. § 1B1.13, cmt 1(D).

    While the Sentencing Guidelines require that such "Other Reasons" under U.S.S.G.

§ 1B1.13, cmt 1(D) must be determined by the Director of the BOP, the policy statement was last

amended by the Sentencing Commission in November 2018, before the First Step Act was passed,

and it still requires a motion filed by the BOP.  For that reason, "a growing number of district

courts have concluded the [Sentencing] Commission lacks" a policy statement applicable to the

post-First Step Act statute of compassionate release.  *United States v. Mondaca*, No. 89-CR-0655

DMS, 2020 WL 1029024, at *3 (S.D. Cal. Mar. 3, 2020) (internal quotation marks omitted); *see

also United States v. Brown*, 411 F. Supp. 3d 446, 449-50 (S.D. Iowa 2019) (collecting cases).  In

*United States v. Cantu*, the court explained:

> Given the changes to the statute, the policy-statement provision that was previously
> applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does
> not comply with the congressional mandate that the policy statement must provide
> guidance on the *appropriate use* of sentence-modification provisions under § 3582.

423 F. Supp. 3d 345, 351 (S.D. Tex. June 17, 2019), *order amended on reconsideration*, No.

4:05-CR-00227-1, 2020 WL 2091802 (S.D. Iowa Apr. 29, 2020) (emphasis in original).

Similarly, in *Redd*, the court noted that U.S.S.G. § 1B1.13 "by its terms applies only to motions for

compassionate release filed by the BOP Director, not motions filed by defendants."  *Id.*, 2020 WL

1248493, at *6.  Therefore, the *Redd* court concluded, "there does not currently exist, for the purposes of satisfying the First Step Act's 'consistency' requirement, an 'applicable policy statement.'"  *Id.*

Indeed, the majority of district courts reviewing this provision, including numerous courts in this Circuit, have concluded that the First Step Act authorizes courts to make their own independent assessment of whether "extraordinary and compelling reasons" exist under the catch-all provision of 18 U.S.C. § 3582 (c)(1)(A).  *See Haynes*, 2020 WL 1941478, at *14 ("Since *Cantu* was issued in June 2019, at least twelve other federal district courts of which this Court is aware have considered the relationship between the FSA-amended compassionate release statute and Application Note 1(D) and have reached essentially the same conclusion as *Cantu*."); *see also, e.g.*, *United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058, at *7 (S.D.N.Y. Apr. 6, 2020) (discussing courts' "newfound authority" under the FSA "to reduce sentences based on 'extraordinary and compelling reasons' (even if those reasons do not relate to [factors enumerated in U.S.S.G. § 1B1.13])").

## III.   MR. ALLUMS'S PARTICULAR VULNERABILITY TO COVID-19 CONSTITUTES A "EXTRAORDINARY AND COMPELLING" REASON UNDER 18 U.S.C. § 3582(C)(1)(A)(I) THAT WARRANTS A REDUCTION IN SENTENCE

The present global pandemic is an extraordinary circumstance beyond what most Americans have experienced in their lifetimes.  On March 11, 2020, the World Health Organization ("WHO") officially classified the new strain of coronavirus, COVID-19, as a pandemic.[1]  Over the last several months, the United States has become the global epicenter of the

---

[1]     *WHO Characterizes COVID-19 as a Pandemic*, WHO (Mar. 11, 2020), https://bit.ly/2W8dwpS.

pandemic.  More than two million Americans have contracted the virus, and at least 114,745 have died.[2]

As mentioned above, COVID-19 has been sweeping jails and facilities around the country, including facilities administered by the BOP.  As of June 12, the virus has penetrated 66 BOP facilities (that is, over half of all 122 BOP institutions nationwide), killing at least 80 inmates and infecting over 6,000.[3]  Since mid-April, there has been an average of eight federal inmate deaths per week.[4]  The diagrams below, prepared by the Federal Defenders of New York based on data published by the BOP, illustrate the astounding rate of infection among the federal prisoners—almost seven times that for the population of the United States as a whole.[5]

**BOP-Reported Positive Tests for COVID-19 Nationwide**[1]



[2]     *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. TIMES (regularly updated), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited June 12, 2020).

[3]     *See* COVID-19 Update – BOP, https://www.bop.gov/coronavirus/ (updated daily; last visited June 13, 2020); *see also* Federal Defenders of New York: https://federaldefendersny.org/ (last visited June 12, 2020).

[4]     *See A State-by-State Look at Coronavirus in Prisons*, THE MARSHALL PROJECT (regularly updated), https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons (last visited June 13, 2020).

[5]      *See* Federal Defenders of New York, *supra* note 3.



As startling as these figures are, they are almost certainly an undercount given the limited testing that has been made available to BOP facilities.[6]  Moreover, the outbreaks occurring within the walls of several BOP facilities suggest that the BOP is far from equipped to prevent the introduction of the virus into the facilities or contain the spread once the virus is there.  Despite the BOP's supposed months of planning for COVID-19, its actual response has been a patchwork of ineffectual efforts, leading tragically, yet unsurprisingly, to an explosion of cases among its imprisoned population, killing dozens and sickening thousands.

A.   **Mr. Allums's Underlying Medical Conditions Make Him Particularly Vulnerable to COVID-19**

Mr. Allums is a 43-year-old black male who suffers from hypertension and asthma, comorbidities that, under the guidance published by the Centers for Disease Control and Prevention ("CDC"), place him at heightened risk of contracting the novel coronavirus and, if infected, of becoming severely ill or dying from COVID-19.

---

[6]        *See* COVID-19 Update – BOP, *supra* note 3 (as of June 12, 16,573 out of 133,678 federal inmates, or 12% of the total federal inmate population, have completed testing).

A ████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

Hypertension poses a significant health risk in light of the COVID-19 pandemic.  The CDC

identifies hypertension as among a number of preexisting medical conditions that place

---

[7] ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████

[8]    See American Heart Ass'n., *Understanding Blood Pressure Readings*, HEART.ORG,
https://www.stroke.org/-/media/dataimport/downloadables/f/9/8/pe-abh-what-is-high-blood-pressure-ucm_300310.pdf.

[9]    *Electrocardiogram (ECG or EKG)*, MAYO CLINIC,
https://www.mayoclinic.org/tests-procedures/ekg/about/pac-20384983.

[10]    Defense counsel is in the process of obtaining additional medical records from the BOP, as the medical records we received from the BOP do not cover the period from May 28, 2020 to the present.

[11]    *See supra* note 8.

11

individuals at higher risk for serious COVID-related illnesses.[12]  Multiple studies in the United

States have found hypertension to be one of the most common underlying conditions in patients

suffering from COVID-19.[13]  Moreover, a report released by the Chinese Central for Disease

Control and Prevention, based on a study of over 70,000 COVID-19 patients, indicates that while

the average fatality rate is 2.3%, the fatality rate among those with preexisting comorbidities was

higher—in the case of hypertension, nearly tripled (6%).[14]

Numerous courts, including many in the Second Circuit, have held that the higher risk of

COVID-19 infection for individuals suffering from hypertension is of acute concern and provides

support for a finding of extraordinary and compelling circumstances warranting release.  *See, e.g.*,

*United States v. Sedge*, No. 1:16-CR-00537-KAM, 2020 WL 2475071, at *3 (E.D.N.Y. May 13,

2020); *United States v. Valencia*, No. 1:15-CR-00163-AT-1, 2020 WL 2319323, at *6 (S.D.N.Y.

May 11, 2020); *United States v. Pena*, No. 1:15-CR-00551-AJN-1 (AJN), 2020 WL 2301199, at

*4 (S.D.N.Y. May 8, 2020); *United States v. Quintero*, No. 08-CR-6007L, 2020 WL 2175171, at

*1 (W.D.N.Y. May 6, 2020); *United States v. Musumeci*, No. 1:07-CR-00402-RMB-1, ECF No.

58 (S.D.N.Y. Apr. 28, 2020); *United States v. Logan*, No. 1:12-cr-00307-LEK-1, ECF No. 179

---

[12]     *Groups at Higher Risk for Severe Illness*, CDC,
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#serious-heart-conditions

[13]     *See, e.g.*, Ernesto L Schiffrin, John M Flack, Sadayoshi Ito, Paul Muntner, R Clinton Webb, Hypertension and COVID-19, *American Journal of Hypertension*, Volume 33, Issue 5, May 2020, Pages 373–374, DOI: https://doi.org/10.1093/ajh/hpaa057, available at https://academic.oup.com/ajh/article/33/5/373/5816609; Garg S, Kim L, Whitaker M, et al. Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET, 14 States, March 1–30, 2020. MMWR Morb Mortal Wkly Rep 2020; 69:458–464. DOI: http://dx.doi.org/10.15585/mmwr.mm6915e3external icon; Richardson S, Hirsch JS, Narasimhan M, et al. Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area. *JAMA*. Published online April 22, 2020. DOI: 10.1001/jama.2020.6775, available at https://jamanetwork.com/journals/jama/fullarticle/2765184.

[14]     Wu Z, McGoogan JM. Characteristics of and Important Lessons From the Coronavirus Disease 2019 (COVID-19) Outbreak in China: Summary of a Report of 72 314 Cases From the Chinese Center for Disease Control and Prevention. *JAMA*. 2020; 323 (13): 1239–1242. Doi:10.1001/jama.2020.2648, available at https://jamanetwork.com/journals/jama/fullarticle/2762130.

(N.D.N.Y. Apr. 22, 2020); *United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at

*9 (S.D.N.Y. Apr. 20, 2020); *United States v. Sawicz*, No. 08-CR-287 (ARR), 2020 WL 1815851,

at *2 (E.D.N.Y. Apr. 10, 2020); *United States v. Hansen*, No. 1:07-CR-00520-KAM-2, 2020 WL

1703672, at *4 (E.D.N.Y. Apr. 8, 2020); *United States v. Gross*, No. 1:15-CR-00769-AJN-3, 2020

WL 1673244, at *1 (S.D.N.Y. Apr. 6, 2020); *United States v. Zukerman*, No. 16 CR. 194 (AT),

2020 WL 1659880, at *1 (S.D.N.Y. Apr. 3, 2020).

Asthma, another common condition suffered by American adults,[15] also poses a special

health concern in light of COVID-19.  Like hypertension, asthma has been identified by the CDC

as a risk factor for COVID-19.[16]  "People with moderate to severe asthma may be at higher risk of

getting very sick from COVID-19[,]" the CDC warns, "COVID-19 can affect your respiratory

tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute

respiratory disease."[17] ███████████████████████████████████ *See* PSR ¶ 77. ██

████████████████████████████████████████████████████████

████████████████████████████████████████ ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ ███████████████████████████████████████

███████████████████████████████████h at is hardly surprising, given the large percentage of

[15]    *Most Recent National Asthma Data*, CDC,
https://www.cdc.gov/asthma/most_recent_national_asthma_data.htm.

[16]    CDC, *supra* note 12.

[17]    *People with Moderate to Severe Asthma*, CDC,
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html.

the U.S. population unknowingly living with undiagnosed asthma[18] and the notorious lack of adequate medical treatment in U.S. prisons in general.

As with hypertension, courts around the country have granted compassionate release to individuals suffering from asthma, recognizing that the risks posed by it support a finding of extraordinary and compelling circumstances.  *United States v. Schafer*, No. 6:18-CR-06152 (EAW), 2020 WL 2519726, at *6 (W.D.N.Y. May 18, 2020); *United States v. Gorai*, No. 2:18-cr-00220-JCM-CWH-1, 2020 WL 1975372, at *3 (D. Nev. Apr. 24, 2020) (releasing 34-year-old defendant with asthma as the only listed medical condition); *United States v. Park*, No. 16-CR-473 (RA), 2020 WL 1970603, at *3 (S.D.N.Y. Apr. 24, 2020) (releasing 44-year old defendant with asthma); *United States v. Tillman*, No. 1:07-CV-197, 2020 WL 1950835, at *4 (W.D. Mich. Apr. 23, 2020).

The comorbidity of hypertension and asthma—both COVID-19 risk factors identified by the CDC—poses a unique risk to Mr. Allums.  Studies show that patients with asthma are more likely to have high blood pressure, and, in turn, the presence of hypertension is associated with the increased severity of asthma.[19]  Moreover, patients suffering from both asthma and hypertension demonstrate heightened rates of asthma morbidity.[20]  This relationship is further complicated by

---

[18]     *NYC study raises questions about undiagnosed asthma in US*, HEALIO (APR. 23, 2020), https://www.healio.com/news/pediatrics/20190416/nyc-study-raises-questions-about-undiagnosed-asthma-in-us; *Underdiagnosis and Overdiagnosis of Asthma* (APR. 14, 2018), ATS Journals, available at https://www.atsjournals.org/doi/full/10.1164/rccm.201804-0682CI.

[19]     Zolotareva, O., Saik, O.V., Königs, C. et al. Comorbidity of asthma and hypertension may be mediated by shared genetic dysregulation and drug side effects. Sci Rep 9, 16302 (2019). https://doi.org/10.1038/s41598-019-52762-w, available at https://www.nature.com/articles/s41598-019-52762-w#citeas.

[20]     Sandra C. Christiansen MD, Michael Schatz MD, MS, Su-Jau Yang PhD, Eunis Ngor MS, Wansu Chen MS Bruce L. Zuraw MD, Hypertension and Asthma: A Comorbid Relationship. *The Journal of Allergy and Clinical Immunology: In Practice*, Vol. 4, Issue 1, Jan.–Feb. 2016, Pages 76-81, DOI: https://doi.org/10.1016/j.jaip.2015.07.009, available at https://www.sciencedirect.com/science/article/abs/pii/S2213219815003906?via%3Dihub.

the fact that many common hypertension medications have been found to constrict airways, exacerbating asthma symptoms.[21]   Indeed, many prisoners who have been granted compassionate release on COVID-19 grounds suffer from both hypertension and asthma.  *See, e.g.*, *United States v. Ennis*, No. EP-02-CR-1430-PRM-1, 2020 WL 2513109 (W.D. Tex. May 14, 2020) (hypertension and asthma); *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008, at *6 (E.D. Mich. May 7, 2020) ("numerous medical conditions," including hypertension and asthma); *United States v. Ardila*, No. 3:03-CR-264 (SRU), 2020 WL 2097736, at *2 (D. Conn, May 1, 2020) (hypertension and asthma).

**B.   Mr. Allums Stands a Statistically Higher Chance of Becoming Severely Ill or Dying From COVID-19**

Studies show that, because he is black, Mr. Allums is at greater risk of contracting COVID-19.[22]   Chronic stress due to discrimination, inequality, and institutional racism each play a role in increasingly the vulnerability of blacks to this and other infectious diseases.[23]   And, once infected with the virus, black adults are disproportionately more likely to become seriously ill and require hospitalization.[24]   The data collected by the CDC show "an overrepresentation of blacks among hospitalized [COVID-19] patients."[25]   Black adults also face far higher rates of

---

[21]     Craig O. Weber, MD, *The Effects of Hypertension Medications on Asthma*, Verywellhealth (May 4, 2020), https://www.verywellhealth.com/the-effects-of-high-blood-pressure-medication-on-asthma-1764113.

[22]     Allison Aubrey, *Who's Hit Hardest By COVID-19? Why Obesity, Stress And Race All Matter*, NPR News (Apr. 18, 2020), https://www.npr.org/sections/health-shots/2020/04/18/835563340/whos-hit-hardest-by-covid-19-why-obesity-stress-and-race-all-matter.

[23]     Sherita Hill Golden, M.D., M.H.S., *Coronavirus in African Americans and Other People of Color*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/covid19-racial-disparities (last visited June 11, 2020).

[24]     *COVID-19 in Racial and Ethnic Minority Groups*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html (last visited June 11, 2020).

[25]     *Id.*

death—nationwide, "black people are more than 3.5 times more likely to die of COVID-19 than white people."[26]  In Chicago, black people account for 72% of COVID-19 related deaths, even though they make up only one-third of the city's population.[27]  In the State of Georgia, over 80% of the COVID-19 patients hospitalized in April were black, compared to the 32% of the state population black people represent.[28]  Similar racial disparities in COVID-19 infection and fatality rates have been reported out of major cities around the country, including New York, Detroit, and Washington D.C.[29]  As the CDC explains, these disparities in hospitalization and deaths are often attributable to the fact that racial/ethnic minority populations in the United States tend to experience lesser economic and social conditions—including the fact that black Americans have "higher prevalence rates of chronic conditions."[30]

Accordingly, in considering his motion for compassionate release, the Court should take into account Mr. Allums's unique susceptibility to COVID-19 caused by his race.  *See United States v. Barber*, No. 6:18-CR-00446-AA, 2020 WL 2404679, *4 (D. Or. May 12, 2020) (acknowledging that "African Americans have been particularly affected by higher rates of infections and death resulting from infection").

---

[26]     Bill Hathaway, *New analysis quantifies risk of COVID-19 to racial, ethnic minorities*, YALE NEWS (MAY 19, 2020), https://news.yale.edu/2020/05/19/new-analysis-quantifies-risk-covid-19-racial-ethnic-minorities.

[27]     Connor Perrett, *Black people account for 72% of COVID-19 deaths in Chicago while making up less than a third of city's population, mayor says*, BUSINESS INSIDER (APR. 12, 2020), https://www.businessinsider.com/covid-19-chicago-72-percent-black-mayor-says-2020-4.

[28]     Jason Silverstein, *More than 80% of hospitalized COVID-19 patients in Georgia last month were black, CDC study finds*, CBS NEWS (APR. 30, 2020), https://www.cbsnews.com/news/georgia-coronavirus-patients-black-covid-19/.

[29]     *See id.*; *see also* Deborah Barfield Berry, *Black People Dying From Coronavirus At Much Higher Rates In Cities Across The USA*, USA TODAY (Apr. 7, 2020), https://www.usatoday.com/story/news/nation/2020/04/07/who-dying-coronavirus-more-black-people-die-major-citie s/2961323001/; Grace Hauck, et al., *Coronavirus spares one neighborhood but ravages the next. Race and class spell the difference.*, USA TODAY (MAY 20, 2020), https://www.usatoday.com/in-depth/news/nation/2020/05/02/coronavirus-impact-black-minority-white-neighborhoo ds-chicago-detroit/3042630001/.

[30]     CDC, *supra* note 12.

C.   **The Conditions of Confinement at FCI Loretto Make it Extremely Difficult for Mr. Allums to Adequately Practice Self-Care**

Prisons have been repeatedly recognized as hotspots for the virus; living conditions make social distancing nearly impossible, prison employees travel in and out of the facilities daily, and prisons often have inadequate testing and protective gear for staff, let alone inmates.  (*See generally* Ex. D – Affidavit of Dr. Brie Williams MD.)  As noted above, even the BOP's own data indicate that the virus has penetrated over half of all 122 facilities around the country, causing major outbreaks in several.  Although many states have managed to "flatten the curve," the same is not true for the imprisoned population: counting both state and federal penitentiary facilities, "[b]y June 9, at least 43,967 people in prison had tested positive for the illness, an *8 percent increase* from the week before."[31]  The BOP alone has added nearly 400 confirmed cases since May 31.[32] In short, any prison could be the next hotspot.

The risk of COVID-19 to a vulnerable inmate, like Mr. Allums, cannot be overstated. Among other things, it "presents a serious physical or medical condition . . . that substantially diminishes the ability of [Mr. Allums] to provide self-care within the environment of a correctional facility."  *United States v. Hird*, Case No. 2:13-cr-39-TJS (E.D. Pa. May 19, 2020), ECF No. 650; *see also United States v. Atkinson*, No. 2:19-CR-55 JCM (CWH), 2020 WL 1904585, at *3 (D. Nev. Apr. 17, 2020) ("The presence of COVID-19 . . . necessitates a more expansive interpretation of what self-care means" to include COVID-vulnerability coupled with the inability to practice CDC-recommended procedures to safeguard against transmission).

Mr. Allums is incarcerated at FCI Loretto, a low security prison in central Pennsylvania.  A court in the Eastern District of Michigan recently found the conditions in FCI Loretto as follows:

---

[31]      The Marshall Project, *supra* note 4 (emphasis added).

[32]      *See* https://federaldefendersny.org/assets/uploads/BOP_COVID-19_Charts_and_Graphs.6.8__002_.pdf.

> [I]nmates currently "eat, sleep, and interact with each other in a confined space, making it easier for the virus to spread once introduced. Inmates are still being transferred between facilities. Although they are screened for symptoms, they are not tested for the virus, leaving potentially asymptomatic individuals to spread the virus to others. While inmates are being subjected to mandatory quarantine, they are still not provided basic protections from the virus in the facilities. Inmates must purchase their own soap. Hand sanitizer is contraband. In low security facilities, inmates are being quarantined with their own unit, as opposed to individual cells, preventing them from complying with social distancing recommendations.

*Loyd v. United States*, No. CR 15-20394-1, 2020 WL 2572275, at \*3 (E.D. Mich. May 21, 2020) (quoting *Amarrah*, 2020 WL 2220008, at \*3).

That description is consistent with Mr. Allums's report.  Since last year, Mr. Allums has been housed in a 13 by 13 cell with five other men.  There are three sets of bunk beds in the cell, all placed within spitting distance of one another.  Currently, over 100 inmates reside on Mr. Allums's unit ("North 1 Unit"), all of whom share two communal bathrooms, which contain a total of several urinals, four toilets, two sinks, and eight showerheads.  The other common areas, including where inmates make phone calls to friends and family, are also crowded.  While face masks are required for staff and inmates, many of the staff wear theirs on their chins[33]—that is, when they wear them at all.  In the meantime, the inmates do not (and cannot) wear face masks when they are eating, drinking, and sleeping in close quarters.

Beginning in late May, Mr. Allums has been on lockdown with others on his unit, allowed to spend up to one hour every day outside his cell.  Despite the lockdown, inmate transfers between BOP facilities continue to happen.  For example, on Tuesday, an inmate was transferred to Mr. Allums's unit from USP Lee, a BOP facility located in Virginia.  Although there are currently

---

[33]     *See* N. Chung & David Cruz, *Coronavirus Updates: Cuomo Reminds New Yorkers (And Cops) Masks Are Not Chin Guards*, Gothamist (June 13, 2020), https://gothamist.com/news/coronavirus-updates-june-13-2020.

no reported confirmed cases at USP Lee, the transportation of inmates between facilities unavoidably increases the risk of virus transmission.

Given the conditions of confinement, Mr. Allums is powerless to take the preventative self-care measures directed by the CDC to remain safe from COVID-19 infection.  He cannot self-quarantine or partake in "social distancing" in his prison facility.[34]  Instead of hand sanitizer, Mr. Allums must purchase soap from the commissary, a practice that does not encourage frequent cleaning, given that many prisoners have limited access to funds.  Worse, despite having been diagnosed with hypertension nearly four years ago and his recent elevated blood pressure readings, the prison is simply not providing Mr. Allums with the treatment he needs.

### D.   FCI Loretto is Not Immune from the Penetration of COVID-19

The fact that FCI Loretto currently does not have "confirmed" positive cases offers little comfort—and should be accorded no weight in the Court's consideration of Mr. Allums's application—since "zero confirmed cases is likely more a result of a lack of testing than a lack of the virus' presence in the prison."  *Loyd*, 2020 WL 2572275, at *3.  Indeed, the official numbers released by the BOP indicate that, as of June 12, only *12 inmates* in FCI Loretto, or approximately 1.4% of an inmate population of 896,[35] have been tested for COVID-19.[36]  This 1.3% testing rate

---

[34]     *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited June 11, 2020); Keri Blakinger & Beth Schwarzapfel, *How Can Prisons Contain Coronavirus When Purell is Contraband?*, ABA JOURNAL (Mar. 13, 2020), available at https://www.abajournal.com/news/article/when-purell-iscontraband-how-can-prisons-contain-coronavirus.

[35]     FCI Loretto, https://www.bop.gov/locations/institutions/lor/ (last visited June 13, 2020).

[36]     COVID-19 Update – BOP, *supra* note 3.  It appears that the BOP released information regarding testing practices for the first time on June 12, 2020.  For months, defense attorneys and courts around the country had relied on anecdotes, inmate reports, and other unofficial sources of information when it came to just how many tests were being conducted in BOP facilities.  *See, e.g.*, *Schafer*, 2020 WL 2519726, at *5 (noting that "without knowing the percentage of the prison population that has been tested, the fact that there are no positive COVID-19 cases provides little insight into whether the virus has reached the facility"); *Amarrah*, 2020 WL 2220008, at *6 ("the United States could not give the Court any information regarding current testing practices"); *United States v. Asaro*, No. 17-CR-127

shows that the supposed absence of confirmed cases should carry zero weight in terms of informing the Court and the public exactly what the true extent of infections may be within the facility.  *See Amarrah*, 2020 WL 2220008, at *6 ("unless and until FCI Loretto implements a universal testing regimen, the Court gives no weight to the zero 'confirmed' COVID-19 cases statistic").

Even assuming *arguendo* that FCI Loretto *currently* has zero COVID-19 cases (confirmed or not), "it would be Pollyannaish to believe that [FCI Loretto] will escape this pandemic unscathed." *Wise v. United States*, No. CR ELH-18-72, 2020 WL 2614816, at *7 (D. Md. May 22, 2020).  Indeed, "[e]ven in the best run prisons, officials might find it difficult if not impossible to follow the CDC's guidelines for preventing the spread of the virus among inmates and staff: practicing fastidious hygiene and keeping a distance of at least six feet from others." *Atkinson*, 2020 WL 1904585, *3 (quoting *Esparza*, 2020 WL 1696084, at *2 (footnote citation omitted)).  The BOP's recent decision to release Paul Manafort from FCI Loretto is evidence of just that:  the BOP, too, "recognizes the risks to a medically vulnerable inmate in even its facilities with no positive COVID-19 cases." *Schafer*, 2020 WL 2519726, at *2, *5.

Moreover, not only does the lack of testing obscure the true extent of infections within the facility, it could even *increase* the risk of transmission by offering a false sense of security.  The court in *Loyd* expressed concern that, due to the misleading nature of the zero confirmed cases, "inmates and staff members are interacting with one another as normal and blissfully unaware of the virus spreading throughout the prison." *Id.*, 2020 WL 2572275, at *3.  Therefore, the court "refuse[d] to joint FCI Loretto in its ignorance of a deadly virus in plain sight." *Id.* at *4.

---

(ARR), 2020 WL 1899221, at *3 (E.D.N.Y. April 17, 2020) ("absent more information about how much testing the BOP is conducting, it is possible that undetected cases are present in the facility").

Recognizing both the inherent risk of prison conditions in relation to COVID-19 and the lack of testing in BOP facilities, numerous courts, including many in this Circuit, have granted compassionate release to prisoners housed at facilities with no confirmed cases. *See, e.g.*, *United States v. Feucht*, No. 11-CR-60025, 2020 WL 2781600, at *3 (S.D. Fla. May 28, 2020) (releasing prisoner at FCI Jessup because "[z]ero confirmed cases is not the same thing as zero COVID-19 cases") (citations omitted); *United States v. Asaro*, No. 17-CR-127 (ARR), 2020 WL 1899221, at *3 (E.D.N.Y. April 17, 2020) (releasing prisoner at Springfield despite no confirmed cases there); *United States v. Ben-Yhwh*, No. CR 15-00830 LEK, 2020 WL 1874125, at *4, *7 (D. Haw. Apr. 13, 2020) (releasing prisoner at BOP medical facility despite no reported cases).

In sum, despite the zero "confirmed" COVID-19 cases statistic (that is, zero confirmed cases among the 12 inmates tested), the conditions of confinement at FCI Loretto present "particularly acute" challenges in preventing the spread of COVID-19 and make it extremely difficult for vulnerable inmates like Mr. Allums to adequately protect themselves in the face of the virus. *Schafer*, 2020 WL 2519726, at *4.

### E.   Mr. Allums Plainly Meets the Standards Articulated in the DOJ's New Policy Concerning Compassionate Release on COVID-19 Grounds

After months of opposing compassionate release petitions on the grounds that COVID-19 risk does not constitute an "extraordinary and compelling" reason, the DOJ now "take[s] the position that inmates who suffer from a condition identified by the [CDC] as putting them at higher risk for severe illness from COVID19 and who are not expected to recover from that condition, present an 'extraordinary and compelling reason' to be considered for compassionate release—even if that condition in ordinary times would not meet the terms of the policy statement." *Wise*, 2020 WL 2614816, at *6 n.4; *see also, e.g.*, *United States v. Wright*, No. CR TDC-17-0388, 2020 WL 2571198, at *3 (D. Md. May 21, 2020) (the government concedes that

defendant's "diabetes condition, and perhaps other medical conditions she presently has, could constitute 'extraordinary and compelling reasons' under the circumstances of the COVID-19 pandemic").

Mr. Allums meets these criteria.  He suffers from not one but two conditions listed by the CDC—hypertension and asthma—as giving rise to higher risk for severe illness from COVID-19. Both hypertension and asthma are common chronic diseases, which in Mr. Allums's case have gone untreated for years.  It is therefore unlikely that he would recover from either medical condition any time soon.[37]

*    *    *

Based on the foregoing, given the acute risk COVID-19 poses to Mr. Allums's health—as aggravated by the prison environment—this Court should find that "extraordinary and compelling reasons" exist warranting compassionate release.  As a court in this district put it, "there can be no question that . . . the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals."  *United States v. Torres*, No. 87-CR-593 (SHS), 2020 WL 2815003, at *11 (S.D.N.Y. June 1, 2020).

## IV. A REDUCTION IN SENTENCE IS ALSO CONSISTENT WITH THE SENTENCING GOALS SET FORTH IN 18 U.S.C. § 3553(A)

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in section 3553(a) to determine whether a sentencing reduction is

---

[37] Even if the BOP now decides to begin treating Mr. Allums for hypertension, the health risk will likely remain.  A study in the medical journal *The Lancet*, published on March 11, 2020, indicated that ACE Inhibitors, commonly prescribed to patients suffering from hypertension, may result in increased risk of death by individuals who contract the virus.  *See* L Fang, et al., *Are patients with hypertension and diabetes mellitus at increased risk for COVID-19 Infection?*, The Lancet, Vol. 8, Issue 4, Mar. 11, 2020, available at https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30116-8/fulltext.  In fact, two recent decisions in this district have granted post-plea, pre-sentencing release to inmates based at least partially on the fact those individuals' taking ACE Inhibitors subject to heightened risk from COVID-19.  *See* Order, *United States v. Witter*, No. 19-Cr-568 (SHS) (S.D.N.Y. Mar. 26, 2020), ECF No. 40; Order, *United States v. Velasquez (Reinaldo Roman)*, No. 19-Cr-116 (KMW) (S.D.N.Y. Mar. 27, 2020), ECF. No. 155.

warranted.  18 U.S.C. § 3582(c)(1)(A)(i).  While the same factors were previously considered by the Court at sentencing, the underlying circumstances have changed.  Therefore, the calculus on those factors should change accordingly.  Moreover, the Court can, and indeed must, consider "evidence of post-sentencing rehabilitation," which is "highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing." *Pepper v. United States*, 562 U.S. 476, 491 (2011).  In this case, the re-balancing of the § 3553(a) factors compels the conclusion that the approximately 45 months Mr. Allums has already served, combined with his release plan of home confinement under electronic monitoring, is sufficient to satisfy the purposes of sentencing.

The Court's original sentencing decision—139 months—reflected the serious nature of Mr. Allums's offense, which was carefully weighed against the mitigating circumstances presented, resulting in a below-Guidelines sentence.  (*See* Ex. F - Sentencing Hr'g Tr. at 19-25.)  Nevertheless, and despite the fact that he still has significant time remaining on his original sentence, several things have undeniably changed since the time of sentencing that militate in favor of release.  *See Zukerman*, 2020 WL 1659880, at *6.

One overriding factor under § 3553(a) that was not present at the time of sentencing—and, indeed, could not have been foreseen—is the COVID-19 pandemic.  As many courts have articulated, the sentencing purpose of just punishment does not warrant a sentence that includes exposure to a life-threatening illness.  *See, e.g.*, *United States v. Chopra*, No. 18 Cr. 20668 (DMM) (S.D. Fla. June 8, 2020), ECF No. 606 (granting compassionate release to defendant who has served only five months of his 48-month sentence because "I sentenced Defendant to 48 months imprisonment, not death or confinement under threat of serious illness. His crime does not justify exposing him to that level of risk"); *United States v. Hernandez*, No. 18 CR. 834 (PAE), 2020 WL

23

1445851, at *1 (S.D.N.Y. Mar. 25, 2020) ("Had the Court known that sentencing Mr. Hernandez to serve the final four months of his term in a federal prison would have exposed him to a heightened health risk, the Court would have directed that these four months be served instead in home confinement.").

As far as general deterrence is concerned, the original, 139-month sentence imposed by the Court sent a powerful message of the need for respect for the law and achieved the necessary measure of general deterrence. Yet, the Court never intended for that sentence to carry an unreasonable threat of severe illness or death. Nor would the decision to release Mr. Allums now, to protect his health undercut respect for the law.

Moreover, 45 months is not an insignificant term, and one that is many times longer than any of Mr. Allums's previous sentences. *See* PSR ¶ 33 (Mr. Allums's longest prior sentence was 90 days). The time Mr. Allums has already served was sufficient to deter him from committing crimes in the future. *See United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001) ("if a defendant served no time or only a few months for the prior offenses, a sentence of even *three or five years* for the current offense might be expected to have the requisite deterrent effect") (emphasis added). This deterrent effect is further enhanced by Mr. Allums's (justifiable) fear of the virus, which serves as yet another powerful motivator for him never to see another federal courtroom as a defendant.

Under *Pepper*, the Court must also consider "the most up-to-date picture" of the defendant's history and characteristics, which "sheds light on the likelihood that [the defendant] will engage in future criminal conduct." 562 U.S. at 492. Mr. Allums's conduct while incarcerated demonstrates that he no longer poses a danger to the community. As the Court may recall from sentencing, Mr. Allums had spent almost his entire adult life addicted to drugs, and his

struggles with addiction played a significant role in his involvement with the underlying offense in the first place.  (*See* Doc No. 579 (sentencing submission)).  Appreciating that, Mr. Allums embarked on a path to rehabilitation early on.  While still in pretrial custody, he completed the 500-Hour (non-residential) Drug Treatment Program, and the 40-Hour Drug Abuse Education Course, among many other BOP programs.  After sentencing, and even though facing over ten years in prison, Mr. Allums did not give up.  He continued to engage in rehabilitation efforts, including successfully completing seventeen courses since his arrival at FCI Loretto in October 2018.  Mr. Allums is currently taking the G.E.D. class for two hours every day[38] and works as an orderly in his unit.

Despite his incarceration, Mr. Allums's commitment to family—above all, his son █████ ████ remains unwavering.  When speaking with defense counsel on the phone, Mr. Allums's fiancée, Danielle Ramsey, confirmed that Mr. Allums calls her and █████████ on a regular basis and makes significant efforts to stay involved in their son's life.

Mr. Allums's rehabilitation efforts weigh in favor of release.  *See Park*, 2020 WL 1970603, at *5 (granting compassionate release to inmate who had "taken steps to rehabilitate herself while incarcerated over the past 16 months"); *Millan*, 2020 WL 1674058, at *9 (granting compassionate release based primarily on defendant's extraordinary rehabilitation efforts).  Additionally, a positive prison record is further proof that Mr. Allums is very unlikely to re-offend and would not pose a danger to the community if released.  *See Sedge*, 2020 WL 2475071, at *4 (granting compassionate release to an individual in part because he was an "exemplary inmate"); *Haynes*, 2020 WL 1941478, at *17 (reasoning that a defendant would not pose a danger to the community,

---

[38]    Defense counsel is in the process of obtaining Mr. Allums's program history records from the BOP.

despite two disciplinary incidents, because he "has been a good prisoner and then some, having completed hundreds of hours of coursework and having discharged his job duties impressively").

Moreover, Mr. Allums has a verifiable release plan to ensure his successful reintegration into the community as well as the health and safety of both him and those around him. If released, Mr. Allums intends to reside with a friend, Natasha Pope, and Ms. Pope's college-age daughter in a two-bedroom apartment located at ███████████████████ New York.[39] Defense counsel has spoken with Ms. Pope, who advised that she had known Mr. Allums for approximately sixteen years, and that if released Mr. Allums would be more than welcome to reside with her and her daughter in their apartment. Ms. Pope also confirmed that Mr. Allums would have his own bedroom, so that he could meaningfully "isolate" himself from Ms. Pope and her daughter for a period of fourteen days following his release. In terms of transportation from the prison, Ms. Pope owns a car and can drive to FCI Loretto to pick up Mr. Allums, further minimizing any risk of exposure potentially involved in Mr. Allums's taking public transportation.

With respect to the availability of medical treatment, if released, Mr. Allums intends to apply for Medicaid. He also plans to obtain employment as a construction worker. A friend of Mr. Allums, who is currently employed as a construction worker, has previously indicated that he would help Mr. Allums find work on a construction site. Due to the recent lockdown, however, Mr. Allums has not been able to speak with his friend in further detail regarding this job opportunity.

\*          \*          \*

---

[39]      The reason Mr. Allums will not be residing with his fiancée Danielle Ramsey and their son ██████ immediately upon release is that Ms. Ramsey and ████████ currently live with Ms. Ramsey's 90-year-old mother in a two-bedroom apartment in Yonkers, New York, and there is not enough space in the apartment for Mr. Allums to "self-quarantine."

In sum, the totality of the circumstances demonstrates that reducing Mr. Allums's sentence to time served after approximately 45 months in custody is "sufficient, but not greater than necessary" to serve the purposes of sentencing under § 3553(a).  Should the Court be inclined to impose home detention as a condition of supervised release, Mr. Allums would consent to home detention and electronic monitoring.

## V.    SHOULD THE COURT DECLINE TO REDUCE MR. ALLUMS'S SENTENCE TO TIME SERVED, MR. ALLUMS REQUEST A JUDICIAL RECOMMENDATION THAT THE BOP IMMEDIATELY TRANSFER HIM TO HOME CONFINEMENT

To the extent the Court is not inclined to reduce Mr. Allums's sentence to time served, we respectfully request that the Court issue a judicial recommendation that the BOP immediately re-designate Mr. Allums for home confinement.

Although the Court may not order Mr. Allums to be transferred to home confinement—the authority to do so vested solely within the BOP—the Court is nonetheless well within its authority to make a designation recommendation to the BOP.  *See United States v. Engleson*, No. 13-CR-340, 2020 WL 1821797, at *1 (S.D.N.Y. Apr. 10, 2020).  "[T]he BOP routinely relies on judicial recommendations that express the district judge's determination of how a defendant should serve his time."  *United States v. Doshi*, No. 13-CR-20349, 2020 WL 1527186, at *1 (E.D. Mich. Mar. 31, 2020); *see also* 18 U.S.C. § 3621(b)(4) (the BOP "shall designate the place of the prisoner's imprisonment . . . subject to, [among other factors,] recommendations of the sentencing court"). Even after sentencing, the sentencing court continues to "ha[ve] discretion to make recommendations regarding an inmate's placement . . . ."  *United States v. Shields*, No. 12-CR-410, 2018 WL 2728905, at *2 (N.D. Cal. June 7, 2018); *see also United States v. Best*, No. 5:16-CR-236, 2019 WL 5608856, at *1 (E.D.N.C. Oct. 30, 2019) ("The court has authority to issue a post-judgment recommendation to the BOP for placement in community confinement.")

(collecting cases).  Indeed, in light of the pandemic, multiple courts in this district have exercised

this authority in recommending to the BOP that it considers releasing the defendants who may not

otherwise meet the "extraordinary and compelling" standard for compassionate release.  *See, e.g.*,

*United States v. Pinto-Thomaz*, No. 18-CR-579 (JSR), 2020 WL 1845875, at *4 (S.D.N.Y. Apr.

13, 2020) (recommending to the BOP that it "seriously consider" defendant as candidate for

release under the home confinement criteria, since "defendant [is not] a flight risk or a danger to

the community, and release may well be warranted under guidelines that are more lenient than the

'extraordinary and compelling' standard that binds the Court"); *United States v. Knox*, No.

15-CR-445 (PAE), 2020 WL 1487272, at *1 (S.D.N.Y. Mar. 27, 2020) ("In strong terms—which

the Court expects BOP to respect and heed—the Court urges BOP forthwith to determine where

and how Mr. Knox will serve his last seven months in custody.").

On March 27, 2020, Congress passed the CARES Act: "[d]uring the covered emergency

period, if the Attorney General finds that emergency conditions will materially affect the

functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time

for which the Director is authorized to place a prisoner in home confinement under the first

sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines

appropriate."  P.L. 116-136, March 27, 2020, 134 Stat 281, 516.

Placing Mr. Allums in home confinement would be consistent with the directives issued by

the DOJ for home confinement.  By a memorandum dated March 26, 2020, Attorney General

William Barr issued guidance to the BOP, directing it to "prioritize the use of [its] various

statutory authorities to grant home confinement for inmates seeking transfer in connection with the

ongoing COVID-19 pandemic."[40]  On April 3, 2020, Attorney General Barr issued a second

---

[40]      Memorandum of Attorney General William P. Barr, Memorandum for Direction of Bureau of Prisons,

memorandum, in which he underscored the urgency of the situation: "Given the speed with which this disease has spread through the general public, it is clear that time is of the essence."[41]

On April 20, 2020, the BOP issued a memorandum providing "additional guidance" regarding the criteria for furlough and home confinement, and "rescinds guidance previously provided."[42]  Two days later, the BOP issued yet another memorandum providing "additional guidance and direction" concerning, among other things, the "factors" considered by the BOP in determining the eligibility of inmates for home confinement, and purports to "rescind[] the memorandum dated April 3, 2020."[43]

Based on the Attorney General's directives and the subsequent DOJ memoranda, inmates meeting the following criteria are eligible for home confinement:

- vulnerability to COVID-19 in accordance with the CDC guidelines;

- primary or prior offense history does not include violence, a sex offense, or terrorism related;

- has not engaged in violent or gang-related activity in prison;

- has maintained clear conduct for the past 12 months;

- does not have a current detainer;

- has a verifiable release plan.[44]

---

Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic (Mar. 26, 2020), available at https://www.justice.gov/file/1262731/download.

[41]     Memorandum of Attorney General William P. Barr, *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020), available at https://www.justice.gov/file/1266661/download.

[42]     Memorandum for Correctional Program Administrators Re: Furlough and Home Confinement Additional Guidance (Apr. 20, 2020), available at
https://www.lisa-legalinfo.com/wp-content/uploads/2020/04/CARES_Act_memo.pdf.

[43]     Memorandum for Chief Executive Officers Re: Home Confinement (Apr. 22, 2020), available at https://famm.org/wp-content/uploads/bop-memo-4.23.2020.pdf.

[44]     *See supra* notes 39-42.

The directives also instruct the BOP to "prioritize[] for consideration" those inmates who reside in low or minimum security facilities, and those who either have served 50% or more of their sentences, or have 18 months or less remaining on their sentences and have served 25% or more of their sentences.  But failing to meet these criteria should not serve as a reason for denial.[45]  In the meantime, applications for home confinement by inmates who have anything above a minimum PATTERN score are not to receive priority treatment.[46]

As discussed above, Mr. Allums is a black adult who suffers from medical conditions that make him particularly vulnerable to COVID-19 in accordance with the CDC guidelines.  His primary or prior offense does not include violence or a sex offense, and is not terrorism related. While we have yet to receive his disciplinary records from the BOP, Mr. Allums reports that he has not engaged in any violent or gang-related activity in prison and has maintained a clear conduct for the past year.  He does not have a current detainer and, as detailed above, has a verifiable release plan.  Mr. Allums's eligibility for home confinement is further corroborated by Warden Moser's May 19 letter, which did not identify any factor that disqualifies Mr. Allums for home confinement.  (*See* Ex. B.)  Moreover, even though Mr. Allums has a "low" (rather than "minimum") PATTERN score[47] and have not served 50% of his sentence—the two factors cited in Warden Moser's May 19 letter in denying Mr. Allums "priority treatment" (*see id.*)—they do not render Mr. Allums ineligible for home confinement.  Also, the fact that he is housed at a low security facility militates in favor of his application for home confinement being "prioritized."

Accordingly, Mr. Allums requests that the Court recommend that the BOP—which has "the latitude to mitigate health risk including by . . . act[ing] with acute sensitivity to

---

[45]     *Supra* note 42.

[46]     *Id.*

[47]     Defense counsel is in the process of obtaining Mr. Allums's PATTERN records from the BOP.

[Mr. Allums's] health and safety"—release him to serve a portion of his sentence in home confinement until the COVID-19 crisis passes or the sentence is complete, whichever is earlier. *United States v. Credidio*, No. 19-CR-111 (PAE), 2020 WL 1644010, at *3 (S.D.N.Y. Apr. 2, 2020); *see also, e.g.*, *United States v. Collins*, No. 2:15-CR-176, 2018 WL 1157508, at *2 (E.D. Cal. Mar. 5, 2018) (granting defendant's motion for judicial recommendation and recommending "that BOP place Defendant in an appropriate pre-release placement for the maximum time for which she is eligible"); *United States v. Ahmed*, No. 1:07-CR-647, 2017 WL 5166427, at *3 (N.D. Ohio Nov. 8, 2017) (granting defendant's motion for judicial recommendation "and recommend[ing] that the Bureau of Prisons promptly end his prison confinement and transfer him to a Residential Reentry Center to begin the process of reentry into his home community").

In short, Mr. Allums is eligible and a worthy candidate for home confinement. The BOP has statutory authority to place Mr. Allums in home confinement now, and doing so would be consistent with the directives of the Attorney General and serve the broad public interest. *See United States v. Burrill*, No. 17-CR-00491-RS-1, 2020 WL 1846788, at *3 (N.D. Cal. Apr. 10, 2020) ("Prison conditions mean incarcerated individuals, as well as society as a whole, are safer the more defendants are released."). Accordingly, to the extent the Court is not inclined to grant compassionate release, we urge the Court to issue a recommendation to the BOP, recommending that Mr. Allums be designated to serve a portion of his sentence on home confinement.

## <u>CONCLUSION</u>

For the foregoing reasons, we respectfully request that the Court grant Mr. Allums's motion to reduce his sentence to time served, followed by a term of supervised release that includes home detention as a special condition.  Alternatively, we respectfully request that the Court make a judicial recommendation to the BOP that Mr. Allums be immediately placed in home confinement.

Dated:  New York, New York
       June 15, 2020

                SHER TREMONTE LLP

              By:_____/s/_____

                   Michael Tremonte
                   Heather Y. Han
                90 Broad Street, 23rd Floor
                New York, NY 10004
                (212) 202-260
                mtremonte@shertremonte.com

                *Attorneys for Kaheim Allums*