```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: _____9/29/2020_____
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                                  :
UNITED STATES OF AMERICA,                                         :
                                                                  :
                         -v-                                      :          S6 15-CR-153 (VSB)
                                                                  :
KAHEIM ALLUMS,                                                    :          **OPINION & ORDER**
                                                                  :
                              Defendant.                          :
                                                                  :
------------------------------------------------------------------X


<u>VERNON S. BRODERICK, United States District Judge</u>:

          Before me is the motion of Kaheim Allums ("Defendant" or "Allums") pursuant to 18

U.S.C. § 3582(c)(1)(A) "to reduce his sentence to time served followed by a term of supervised

release with a special condition of home detention" because he "suffers from hypertension and

asthma, which place him at heightened risk of contracting and becoming severely ill from

COVID-19[1]" which, among other things, "provides an extraordinary and compelling basis for

compassionate release."  (Allums Mot. 1.)[2]  Because Allums has not met his burden of

establishing that there exist extraordinary and compelling reasons to reduce his sentence and

grant his release, his motion for compassionate release is DENIED.

---

[1] "COVID-19" refers to the coronavirus disease 2019.  *See generally Coronavirus Disease 2019 (COVID-19)*,
*Frequently Asked Questions*, Centers for Disease Control and Prevention (last updated Sept. 18, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/faq.html.

[2] "Allums Mot." refers to the motion of Kaheim Allums to reduce his sentence filed on June 16, 2020.  (Doc. 670.)

## I.        **Background and Procedural History**[3]

On June 28, 2017, Allums and two co-defendants were charged in a two-count

superseding indictment.  (*See* Doc 266 ("S6 Indictment").)  Count One charged Allums and his

co-defendants with conspiring to distribute and possess with intent to distribute controlled

substances under 21 U.S.C. § 841(a)(1), including five or more kilograms of cocaine and 280

grams or more of crack cocaine in violation of 21 U.S.C. § 841(b)(1)(A).  (S6 Indictment ¶¶ 1–3;

PSR ¶ 2.)  Count Two charged Allums and his co-defendants with possessing a firearm in

furtherance of the narcotics conspiracy under 18 U.S.C. § 924(c).  (S6 Indictment ¶¶ 4; PSR ¶ 3.)

Kaheim Allums pled guilty to Count One of the S6 Indictment on October 13, 2017.

(PSR ¶ 5.)  Trial of Allums's co-defendants—Yonell Allums and Darnell Frazier—commenced

on October 23, 2017.  During trial, the Government introduced evidence that the property at 173

Woodworth Avenue, Yonkers, New York—the store, apartment, and surrounding grounds—was

the base of operations for the drug organization run by Yonell Allums, Kaheim Allums's uncle.

(*See, e.g.*, Trial Tr. at 122–43, 183, 186, 641–51, 753–70, 805–06, 827–47; GX 1–5 (drugs

purchased from store property in 2016); GX 6A, B, C, D, E, F, L, Q, R, S (drugs and drug

paraphernalia seized from apartment in 2016); GX 7A, B, C, D (drugs and drug paraphernalia

seized from apartment in 2012).)[4]

 During trial four cooperating witnesses—Steven Christopher, Candice Southerland,

Daryl Bracy, and Anthony Alexander—among other witnesses, testified for the Government.

All four cooperating witnesses were members of the narcotics conspiracy at different points in

---

[3] The facts contained in this section are taken from Indictment S6 15 Cr. 153, Defendant's Presentence Investigation Report ("PSR"), the trial of Darnell Frazier and Yonell Allums, and Defendant's allegations in the complaint filed in this case on October 26, 2016, ("Complaint" or "Comp.").  (Doc. 1.)  These facts are merely provided for background, and I do not rely upon them in deciding Defendant's motion.

[4] "Trial Tr." refers to the transcript of the trial in this matter.  "GX" refers to the exhibits entered in evidence by the Government at the trial.

time between 2011 and 2016.  Two of the cooperators—Christopher and Southerland—testified that Yonell Allums acted as their supplier of cocaine, providing them with drugs at the store located at 173 Woodworth Avenue.  (*See, e.g.*, Trial Tr. at 180, 185–86, 682–83.)  Christopher also testified that he personally cooked cocaine into crack for Yonell Allums and saw Yonell Allums cooking cocaine into crack himself.  (*See, e.g.*, *id.* at 193.)  All four cooperators also testified to seeing guns on the store property, and Christopher testified that he personally saw Yonell Allums in possession of a firearm at the store during the course of the conspiracy.  (*See, e.g.*, *id.* at 246–47, 691, 819, 1107.)  The cooperators corroborated each other, and their testimony was further corroborated by, among other things, call records among alleged conspirators, seizures of drugs on two occasions from the apartment above the store located at 173 Woodworth Avenue, and recorded controlled purchases of crack cocaine from Allums's nephew—Kaheim Allums—on the store property.  (*See, e.g.*, GX 1–5, 6A–6V, 7A–7D, 202A–203H, 501–517, 802, 803.)  Kaheim Allums purportedly worked in, lived in, prepared, and sold drugs in and around the store at 173 Woodworth Avenue.  (PSR ¶¶ 30.)  Indeed, Kaheim Allums lived in the apartment during various points during the conspiracy, and lived their when drugs were seized from the apartment pursuant to search warrants, (*see e.g.* Trial Tr. at 808, 1859), and Bracy testified that he purchased drugs from Kaheim Allums, including recorded controlled purchases of crack cocaine, (*see e.g.*, Trial Tr. at 804, 825, 1049).  In addition, "[t]o protect this lucrative drug business, [Allums] personally possessed firearms and had other members of the organization carry firearms for his protection."  (PSR ¶ 29.)

Allums's plea agreement calculated Defendant's Sentencing Guidelines range as 151 to 188 months' imprisonment, and a mandatory minimum term of imprisonment of 120 months' imprisonment.  After considering the factors contained in 18 U.S.C. § 3553(a), I sentenced Allums to 139 months' imprisonment, and five years of supervised release.  (*See generally* Doc.

592.)  Allums is currently housed in the FCI Loretto, and his release date is July 6, 2026.  *Find*

*an Inmate*, Fed. Bureau of Prisons (last visited Sept. 24, 2020), https://www.bop.gov/inmateloc/.

Defendant's motion for compassionate release was filed on June 16, 2020.  The

Government filed its opposition to Defendant's motion on June 26, 2020, (Govt. Opp.),[5] and

Defendant filed his reply on July 13, 2020, (Reply).[6]

## II.    <u>Discussion</u>

Allums seeks compassionate release "to reduce his sentence to time served followed by a

term of supervised release with a special condition of home detention" because he "suffers from

hypertension and asthma, which place him at heightened risk of contracting and becoming

severely ill from COVID-19", and his incarceration by the Bureau of Prisons ("BOP") does not

permit him "to adequately practice self-care," which "provide[] an extraordinary and compelling

basis for compassionate release."  (Allums Mot. 1, 10–19.)  Allums also argues that "because he

is black, [he] is at greater risk of contracting COVID-19" because "disparities in hospitalization

and deaths are often attributable to the fact that racial/ethnic minority populations in the United

States tend to experience lesser economic and social conditions—including the fact that black

Americans have higher prevalence rates of chronic conditions."  (*Id*. at 15–16.)  In opposition,

the Government argues that:  (1) because Allums has an appeal pending, I lack jurisdiction to

grant his motion but I can deny it, (Govt. Opp. 3–4); (2) his purported health ailments do not

establish extraordinary and compelling reasons for compassionate release, (*id*. at 5–6); (3)

Allums' "relative health, economic, and social conditions are known quantities", "he has not

established that he in fact has the sort of chronic conditions that place him at higher risk" and he

---

[5] "Govt. Opp." refers to the Government's letter in opposition to Defendant's compassionate release motion dated June 22, 2020.  (Doc. 290.)

[6] "Reply" refers to Defendant's letter in reply to the Government's opposition dated June 25, 2020.  (Doc. 291.)

"has the same access to healthcare that his fellow inmates do", (*id*. at 6); (4) Allums has not established that he would be less at risk in an apartment in the Bronx than he would be in FCI Loretto, (*id*. at 7); and (5) the section 3553(a) factors militate against reducing his sentence and "would disserve the purposes of sentencing", (*id*. at 8).

### A.  *Applicable Law*

"A court may not modify a term of imprisonment once it has been imposed except pursuant to statute." *United States v. Gotti*, 433 F. Supp. 3d 613, 614 (S.D.N.Y. 2020).  Section 3582(c)(1)(A)(i), the compassionate release statute, provides one such exception.  The compassionate release statute permits a court to "reduce" a term of imprisonment, after considering the factors set forth in 18 U.S.C. § 3553(a), if "it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."[7]  18 U.S.C. § 3582(c)(1)(A).

Until recently, a court could not order compassionate release unless the BOP requested such relief on a prisoner's behalf.  *See* U.S.S.G. § 1B1.13; *see also Gotti*, 433 F. Supp. 3d at 614.  However, in December 2018, Congress passed the First Step Act, which did away with BOP's unilateral ability to deny a prisoner compassionate release but did not remove the BOP from the process entirely.  *See id.*  The statute is clear that a court may only grant compassionate release "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the

---

[7] The relevant Sentencing Commission policy statement is found in U.S.S.G. § 1B1.13, although I note that the Sentencing Guidelines have not yet been revised to take into account the First Step Act. *United States v. Russo*, No. 16-CR-441 (LJL), 2020 WL 1862294, *2 (S.D.N.Y. Apr. 3, 2020).  However, the Second Circuit recently interpreted § 1B1.13 in light of the First Step Act, and concluded that when a "compassionate release motion is not brought by the BOP Director, Guideline § 1B1.13 does not, by its own terms, apply to it." *United States v. Zullo*, ___ F.3d ___, No. 19-3218-CR, 2020 WL 5739712, *6 (2d Cir. Sept. 25, 2020).  "Because Guideline § 1B1.13 is not 'applicable' to compassionate release motions brought by defendants, Application Note 1(D) cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling." *Id.*

defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

Requiring inmates to exhaust their administrative remedies before seeking court intervention serves several purposes. First, it protects administrative agency authority by guaranteeing agencies the "opportunity to correct [their] own mistakes," *Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)). Second, it promotes efficiency, since claims "generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." *Id.*

"The provenance of an administrative exhaustion requirement determines its scope." *United States v. Monzon*, No. 99cr157 (DLC), 2020 WL 550220, at *1 (S.D.N.Y. Feb. 4, 2020). There are two types of exhaustion requirements: jurisdictional ones and non-jurisdictional ones. Jurisdictional exhaustion requirements "govern a court's adjudicatory authority" and are not subject to any exceptions. *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) (internal quotation marks omitted). Non-jurisdictional requirements, also referred to as "claim-processing rules," can be "forfeited if the party asserting the rule waits too long to raise the point." *Kontrick v. Ryan*, 540 U.S. 443, 456 (2004). The Second Circuit has not yet squarely answered the question of whether the exhaustion requirement of § 3582(c) is jurisdictional.[8] *Monzon*, 2020 WL

---

[8] Other courts of appeal are split on the question of whether section 3582(c) as a whole is jurisdictional or non-jurisdictional. *Compare United States v. Castenada-Ulloa*, No. 19-6080, --- Fed. Appx. ---, 2020 WL 3422879, at *2 n.4 (10th Cir. June 23, 2020) (applying jurisdictional rule but noting intra- and inter-circuit split); *United States v. Austin*, 676 F.3d 924, 930 (9th Cir. 2012), *and United States v. Auman*, 8 F.3d 1268, 1271 (8th Cir. 1993), *with United States v. Franco*, No. 20-60473, --- F.3d ---, 2020 WL 5249369, at *2 (5th Cir. Sept. 3, 2020) (considering section 3582(c) a claim-processing rule); *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020); *United States v. May*, 855 F.3d 271, 274–75 (4th Cir. 2017); *United States v. Caraballo-Martinez*, 866 F.3d 1233, 1245 (11th Cir. 2017); *United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015); *and United States v. Weatherspoon*, 696 F.3d 416,

550220, at *2. !

      **B.**    *Application*

      **1. Exhaustion**

On May 15, 2020, defense counsel submitted a letter to the warden of FCI Loretto, requesting, among other things, "that the BOP file a motion for compassionate release on Mr. Allums's behalf pursuant to 18 U.S.C. § 3582(c)(1)(A)."  (Allums Mot. 3–4.)  The warden responded on May 19, 2020, denying, among other things, Allums's compassionate release request, and on June 2, 2020, the warden advised all inmates at FCI Loretto that "'they DO NOT need to use or exhaust the Administrative Remedy process' if their requests for compassionate release are denied, and that they 'may file an appeal for a denial . . . directly with the sentencing court 30 days after making the [] request to the Warden.'"  (*Id*. at 4.)  The Government's position is in agreement with the warden.  Specifically, the Government states "because more than 30 days have passed since Allums' filing of his request with the Warden, the Government believes that the administrative exhaustion requirement set forth in 18 U.S.C. § 3582(c)(1)(A) has been satisfied."  (Govt. Opp. 5, n.3.)  Although I have reached a different conclusion, *see United States v. Ng Lap Seng*, 15 Cr. 706 (VSB), 2020 WL 2301202, at *5–*7 (S.D.N.Y. May 8, 2020)[9], the Government has waived its right to challenge Allums's assertion that he has exhausted his

___

421 (3d Cir. 2012).  And while the Second Circuit has not weighed in on whether the exhaustion requirement of section 3582(c)(1)(A) is jurisdictional, it has, "in a related context . . . firmly disagreed with the characterization by certain other circuits that § 3582(c)(2) is jurisdictional." *United States v. Haney*, No. 19-cr-541 (JSR), 2020 WL 1821988, at *2 (S.D.N.Y. Apr. 13, 2020) (citing *United States v. Johnson*, 732 F.3d 109, 116 n.11 (2d Cir. 2013)).

[9] The Second Circuit appears to agree with the conclusion that I reached in *Ng Lap Seng*, 2020 WL 2301202, at *5–*7 (interpreting Section 3582(c)(1)(A)'s "lapse of 30 days" language as requiring the BOP's failure to respond to a prisoner's request for a compassionate release motion within thirty days, giving the court discretion to hear a compassionate release motion if the BOP has failed to timely consider the request). *See Zullo*, 2020 WL 5739712, at *7 ("Congress allowed people seeking compassionate release to avoid BOP if BOP rejects their motions or fails to act on them within a short time period, only 30 days. *See* 18 U.S.C. § 3582(c)(1)(A) (allowing for the filing of a motion with the court when administrative options are exhausted or 30 days pass, "whichever is earlier").  When the BOP fails to act, Congress made the courts the decision maker as to compassionate release. *Id.*").

administrative remedies by agreeing such remedies have been exhausted, *see Russo*, 2020 WL 1862294, at *5 ("[O]ne key consequence of the section not being jurisdictional is that the Government can waive the affirmative defense of exhaustion."). Therefore, I address the substance of Defendant's motion.

**2.  Extraordinary and Compelling Circumstances**

For the reasons that follow, on the current record I do not find that Defendant has met his burden of establishing that there exist extraordinary and compelling reasons to reduce his sentence and grant his early release based upon his claim that he is at increased risk of becoming seriously ill or dying due to his medical conditions if he contracts COVID-19.

a.  High Blood Pressure/Hypertension

The Center for Disease Control and Prevention ("CDC") cautions on its website that it is "learning more about COVID-19 every day, and as new information becomes available" and as a result continually updates information on its website. *People With Certain Medical Conditions*, Centers for Disease Control and Prevention, (last updated Sept. 11, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.  The CDC currently advises that certain medical conditions place people at any age "at increased risk for severe illness from COVID-19", while people with certain other medical conditions "might be at an increased risk for severe illness from COVID-19".  *Id.* Individuals with moderate to severe asthma and hypertension/high blood pressure are both medical conditions that "might" place them "at increased risk for severe illness from COVID-19." *Id.*

"Nearly half of adults in the United States (108 million, or 45%) have hypertension defined as a systolic blood pressure $\geq$ 130 mm Hg or a diastolic blood pressure $\geq$ 80 mm Hg or

are taking medication for hypertension." *Facts About Hypertension*, Centers for Disease Control and Prevention, (Sept. 24, 2020), https://www.cdc.gov/bloodpressure/facts.htm.  Here, prior to being incarcerated Allums had not been diagnosed with having high blood pressure, and he reported that his blood pressure had decreased from his initial arrest to the preparation of his PSR.  (*See* PSR ¶ 77) ("[A]t the time of his arrest for the instant offense, the defendant was diagnosed with hypertension.  During his presentence interview, Allums indicated that his blood pressure had lowered.  He was not prescribed any medication.'")  According to Allums's medical records his blood pressure has ranged from 119/68 to 147/88 between 2016 and 2020.[10] Accepting all the blood pressure readings from the medical records and reported by Allums, five of the readings would be characterized as hypertensive and four fall outside of the range for hypertension (one normal and three elevated).  *See Facts About Hypertension*, Centers for Disease Control and Prevention, (Sept. 24, 2020), https://www.cdc.gov/bloodpressure/facts.htm. Before diagnosing a patient as having hypertension a physician "will likely take two to three blood pressure readings each at three or more separate appointments" "because blood pressure normally varies throughout the day, and it may be elevated during visits to the doctor (white coat hypertension)."  *High blood pressure (hypertension)*, Mayo Clinic, (Sept. 24, 2020), https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/diagnosis-treatment/drc-20373417.  Based upon these blood pressure readings and the diagnostic assessment provided on the Mayo Clinic website, it is a close call whether or not Allums suffers from hypertension, but considering all of the evidence I will assume for the purposes of this motion that he does.[11]

---

[10] Specifically, Defendant's medical records contain the following blood pressure readings:  (1) August 23, 2016 -- 144/90; (2) September 4, 2016 -- 130/81; (3) September 29, 2016 -- 120/77; (4) November 16, 2017 -- 119/68; (5) October 16, 2018 --122/76; (6) November 14, 2018 -- 120/78; and (7) May 26, 2020 -- 147/88.  According to Allums, his most recent blood pressure readings were 151/88 and 139/84.  (Allums Mot. 11 n.7)

[11] In light of Allums's blood pressure readings, BOP is directed to schedule a visit for Allums with a medical professional to determine whether Allums requires medication for his hypertension.

However, at most that would mean that he "might" be "at increased risk for severe illness from COVID-19." It is clear that high blood pressure may under certain circumstances constitute "compelling and extraordinary" circumstances and may be a serious medical condition in some cases depending on the facts, but Allums has not made such a showing here. In short, I cannot find under the circumstances presented here that Allums has met his burden of establishing that his high blood pressure and potentially catching the COVID-19 virus amount to extraordinary and compelling reasons such that he is entitled to compassionate relief. Furthermore, to make that finding I would have to conclude "that a significant portion of the federal prison population who are at risk of COVID-19 . . . would also be entitled to the same relief." *See United States v. Schaefer*, 7-cr-498, 2020 WL 3957396, at *3, (S.D.N.Y. Apr. 29, 2020). I decline to make that finding.

        b.  <u>Asthma</u>

"Asthma is a disease that affects your lungs. It causes repeated episodes of wheezing, breathlessness, chest tightness, and nighttime or early morning coughing." *Asthma*, Centers for Disease Control and Prevention (Sept. 24, 2020), https://www.cdc.gov/asthma. "Asthma severity is determined by current impairment (as evidenced by impact on day-to-day activities) and risk of future exacerbations (as evidenced by frequency of oral systemic corticosteroid use), and allows categorization of disease as intermittent, persistent-mild, persistent-moderate, and persistent-severe. Initial treatment is guided by the disease-severity category." *Overview of Changes to Asthma Guidelines: Diagnosis and Screening*, American Family Physician (Sept. 24, 2020) https://www.aafp.org/afp/2009/0501/p761.html. Persistent-moderate asthma manifests itself in daily symptoms, daily use of short-acting beta agonist[12] use for symptom control, and

---

[12] A beta agonist is "[a] bronchodilator medicine that opens the airways by relaxing the muscles around the airways

some limitation on normal daily activity.  (*Id.* Table 1) Persistent-severe asthma manifests itself in symptoms throughout the day and night, short-acting beta agonist use for symptom control several times a day, and extreme limitation on daily activities.  (*Id.*)

Moderate-to-severe asthma has been identified by the Centers for Disease Control and Prevention ("CDC") as an illness that may place individuals at increased risk of serious illness or death from COVID-19.  *See People of Any Age with Underlying Medical Conditions*, Centers for Disease Control and Prevention (last updated Sept. 11, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. Although, there is little empirical data to support that individuals with moderate-to-severe asthma are in fact at increased risk if they contract COVID-19, *see Asthma is Absent Among Top Covid-19 Risk Factors, Early Data Shows*, New York Times (Apr. 16, 2020), *available at* https://www.nytimes.com/2020/04/16/health/coronavirus-asthma-risk.html, I accept the CDC's current view that moderate-to-severe asthma may place individuals at increased risk of serious illness or death from COVID-19.

At the time Defendant was interviewed by the Probation Department he essentially denied that his asthma was a persistent health issue, stating instead that he "suffered from childhood asthma".[13]  (PSR ¶ 77.)  However, in his motion Allums alters his statement to Probation to suggest that he continued to suffer from asthma into adulthood stating he "has suffered from asthma since childhood."  (Allums Mot. 13.)  Allums also claims that he used to carry an inhaler but "has not had access to an inhaler since 2016."  (*Id.*)  He then describes his

---

that may tighten during an asthma attack or in COPD (chronic obstructive pulmonary disease).  Beta-agonists can be administered by inhalers or orally."  *Definition of Beta-Agonist*, RxList (Sept. 24, 2020), https://www.rxlist.com/script/main/art.asp?articlekey=24664.

[13] I note that Allums did not mention that he had or has asthma in his sentencing submission or during sentencing. (Docs. 579, 686.)

asthma saying that he "sometimes experiences shortness of breath, especially when he engages in any physical exercise." (*Id*.)  Although he concedes that he has not been "officially diagnosed with asthma and [the] condition is not reflected in his BOP medical records." (*Id*.)  Although Allums claims that he is concerned about having an asthma attack when he does not have an inhaler that he "has been avoiding cardio exercises or engaging in any activity that might cause him to over-exert himself" he has not reported that he has suffered asthma attacks during his incarceration. (*Id*.)  As part of his reply—apparently to attempt to address the deficiencies identified by the Government in his initial submission—Allums submitted an affidavit from his fiancée who asserts that (1) Allums "has suffered asthma since he was in his 20s"; (2) she has seen Allums "experience asthma attacks many times—on those occasions, his chest would tighten up and he would not be able to walk or breathe"; (3) Allums's "asthma appears to have gotten worse as he" has gotten older; (4) that "[f]or approximately one year before [Allums's] arrest in August 2016, each month [she] would bring [him] surplus samples of Albuterol (a type of asthma inhaler)" she took from where she work; and (5) Allums would carry the inhaler on him all the time so as to prevent any unexpected onset of an asthma attack. (Reply, Exh. A ¶¶ 3-5.)

Based upon Allums submissions it is not clear to me that he has established that he currently suffers from asthma, because his assertions are not supported by his statement to Probation contained in his PSR, his sentencing submission,[14] or statements made during his sentencing proceeding.  However, I need not resolve this factual inconsistency because even if I accept the factual assertions as sufficient to support that Allums currently suffers from asthma—

---

[14] There are various references in Allums's sentencing submission to his love of basketball and his playing basketball with his uncle and at a youth center. (Doc. 579-1 at 2, 4; 579-3 at 20.)  The sentencing submission do not indicate that Allums's asthma inhibited him from playing basketball.  The page numbers in Doc. 579 refer to the page designations given by the ECF system.

a fact which is debatable—it certainly does not support that Allums suffers from moderate to severe asthma.  Both persistent-moderate asthma and persistent-severe asthma each present with daily symptoms, daily use of short-acting beta agonist, and some limitation on normal daily activity.  Allums does not claim that he has daily asthma symptoms that require daily treatment.  Nor does he claim that his daily activities have been limited in any way because of asthma attacks or symptoms.

Allums has also not shown that he is more at risk of contracting COVID-19 at FCI Loretto than at his home in the Bronx.  FCI Loretto has no inmates with "open cases," and seven staff members with "open cases."  *BOP COVID-19 Modified Operations, COVID-19 Cases*, Federal Bureau of Prisons, (last updated Sept. 24, 2020) https://www.bop.gov/coronavirus/.  In addition, there have been no inmate or staff deaths due to COVID-19, and fifty-seven inmates and three staff members have recovered from COVID-19.  (*Id.*)  By contrast, New York City was widely considered the COVID-19 epicenter for the United States and the world as of March and April, 2020.  *See, e.g.*, Jesse McKinley, *New York City Region Is Now an Epicenter of the Coronavirus Pandemic*, New York Times (March 22, 2020) https://www.nytimes.com/2020/03/22/nyregion/Coronavirus-new-York-epicenter.html.  As of September 24, 2020, 23,780 people have died from, and 245,776 people have been infected with, COVID-19 in New York City.  *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times (last viewed Sept. 24, 2020), https://www.nytimes.com/interactive/2020/us/new-york-coronavirus-cases.html#county.  In Bronx County—where Allums intends to live—as of September 24, 2020, there have been 4,943 deaths and 52,710 people infected with COVID-19, which translates to 343.8 deaths per 100,000 residents and 3,665.8 people infected per 100,000 residents.  *National, Deaths reported per 100,000 residents by county*, The Washington Post (last

viewed Sept. 24, 2020), https://www.washingtonpost.com/graphics/2020/national/coronavirus-us-cases-deaths/?itid=hp_rhp__no-name_hp-in-the-news%3Apage%2Fin-the-news.  Although the trends in New York are moving towards fewer deaths and fewer cases, in the last seven days in New York City there have been 2,462 additional cases, which translates to 29 new cases per 100,000 residents, *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times (last viewed Sept. 24, 2020), https://www.nytimes.com/interactive/2020/us/new-york-coronavirus-cases.html#county, and in Bronx county there have been 288 additional cases, which translates to 20 new cases per 100,000 residents, *National, Deaths reported per 100,000 residents by county*, The Washington Post (last viewed Sept. 24, 2020), https://www.washingtonpost.com/graphics/2020/national/coronavirus-us-cases-deaths/?itid=hp_rhp__no-name_hp-in-the-news%3Apage%2Fin-the-news.  It is, therefore, not clear that Allums's return to the Bronx is a safer alternative than staying at FCI Loretto.

### 3.  Section 3553(a)

Granting Allums's compassionate release motion would require reducing his sentence to time served which would result in a substantial reduction in his sentence.  According to Allums's plea agreement, he faced the initial guideline calculation called for a sentence of between 151 to 188 months' imprisonment.  Allums also faced a mandatory minimum sentence of 120 months' imprisonment.  After considering the factors under 18 U.S.C. § 3553(a), I sentenced Allums to 139 months' imprisonment—a substantial variance from Defendant's Guideline Range.  Allums is scheduled to be released on July 6, 2026; therefore, there are approximately 70 months remaining on his sentence.  For the reasons stated in detail at Allums's sentencing, which are incorporated by reference here and referred, in part, below, I find that modifying Allums's term of imprisonment, when he has served approximately half of his sentence, would disserve the

sentencing factors contained in Title 18, United States Code, Section 3553(a).  I do not find that the circumstances have changed, including due the current health crises due to COVID-19, so dramatically as to warrant a sentence of time served.

Defendant was a central participant in the drug organization run by his uncle Yonell Allums.  He worked in the store, lived in, prepared, and sold drugs in and around 173 Woodworth Avenue, (PSR ¶¶ 30), including cooking cocaine into crack in the apartment.  In addition, he lived in the apartment during various points during the conspiracy, and lived their when drugs were seized from the apartment pursuant to search warrants.  (*See, e.g*., Trial Tr. at 808, 1859).  As Darrell Bracy testified, he purchased drugs from Kaheim Allums, including some drug sales that were recorded controlled purchases of crack cocaine.  (*See, e.g.*, Trial Tr. at 804, 825, 1049).  Allums also possessed firearms at various points during the conspiracy to protect this lucrative drug business run by his uncle, and had other members of the organization carry firearms for his protection.  (PSR ¶ 29.)

As I pointed out during Defendant's sentencing, he had multiple opportunities throughout his life to turn away from selling narcotics.  For example, he could have decided to turn away from the narcotics trade after each of his arrests for trafficking.  (*See* PSR ¶¶ 59–60, 62.)  He also could have decided to stop selling drugs after two search warrants were executed at the apartment where he lived at times in 173 Woodworth Avenue.  Rather than rejecting life as a narcotics trafficker, Allums continued to participate until his arrest on August 23, 2016.

I also note that although Allums was not alleged to have participated in violence, other members of the organization were involved in committing acts of violence.  (*See* PSR 39, 41; Doc. 52-1 ¶ 12c.)  Even though there are no allegations that Allums was involved in acts of violence, narcotics trafficking and possession of firearms raise the specter of danger to the

community.  *See* 18 U.S.C. § 3142(e)(2).

### III.    <u>Conclusion</u>

For the reasons stated above, because I find that on the current record that Defendant has not sufficiently established extraordinary and compelling circumstances justifying the reduction in his sentence and his release from custody, and the Section 3553(a) factors militate against reducing Allums's sentence to time served, Defendant's motion for compassionate release is DENIED.

The Clerk's Office is directed to terminate docket entries 670 and 683.

SO ORDERED.

Dated:    September 29, 2020
          New York, New York

                                         Vernon S. Broderick
                                         United States District Judge

16